NOT FOR PUBLICATION

**United States District Court
for the District Of New Jersey**

<table>
<tr><td>

UNITED STATES ex rel. JEFFREY ZWIRN,

                  Relator,

   v.

ADT SECURITY SERVICES, INC.; TYCO
INTERNATIONAL LTD.; TYCO
INTEGRATED SECURITY LLC,

              Defendants.

</td><td>

Civil No.: 10-2639 (KSH)

**<u>Opinion</u>**

</td></tr>
</table>

<u>**Katharine S. Hayden, U.S.D.J.**</u>

      In May 2010, relator Jeffrey Zwirn filed a *qui tam* complaint [D.E. 1] alleging violations of the False Claims Act (FCA, 31 U.S.C. § 3729 *et seq.*).  He sought treble damages and civil penalties, on behalf of the United States, against defendants Tyco International (now Tyco Integrated Security) and ADT Security Services (together, "ADT").[1]  Zwirn alleged that ADT submitted fraudulent claims for payment in connection with security systems installed in federal courthouses and in federal judges' residences.  The claims for payment allegedly contained false representations about the systems and their compliance with law, best practices, and industry regulations.  After the United States declined to intervene [D.E. 8], the complaint was amended [D.E. 11].

---

[1] When this lawsuit began in 2010, ADT was alleged to be a wholly owned subsidiary of defendant Tyco International.  (Compl. ¶ 15.)  Since then, ADT was apparently spun off into its own company, with Tyco Integrated Security assuming its liabilities.  (Am. Compl. ¶ 15.)  The parties do not dispute the chain of liability and corporate identity plays no role in the evaluation of the pending motion, so the Court will refer to the collective defendants as "ADT" consistent with the moving defendant.

1

Before the Court is ADT's fully briefed motion to dismiss the amended complaint pursuant to Fed. R. Civ. P. 12(b)(6).  [D.E. 13, 18, 19.]

## I. The Amended Complaint

### A) Background, Security Systems, and Alleged Shortcomings

According to the amended complaint, over the past 20 years the United States Marshals Service (USMS) has entered into a series of contracts with ADT for the development and deployment of security systems in locations deemed "high-risk," which include federal courthouses and the homes of federal judges.  (Am. Compl. ¶¶ 3, 25.)  These contracts have become more valuable in recent years because of an increased focus on the security of the federal courts and their employees, and have benefited from increased funding from Congress.  (Am. Compl. ¶¶ 3–7, 16.)  ADT, described as one of the country's largest providers of security systems, installed and provided equipment and monitoring services under these contracts.  (Am. Compl. ¶ 8.)

In his pleading, Zwirn describes himself as one of the nation's leading experts on alarm systems.  He is certified in alarm systems, security, and forensics, and has been an investigator and expert witness. (Am. Compl. ¶¶ 9, 12–13.)  Through his investigative and consulting work, he has become familiar with ADT's business practices and the quality of its systems.  (Am. Compl. ¶ 14.)

Allegedly, ADT regularly and knowingly installs security systems that are deficient in several "mission critical" or "core" areas of functionality in order to cut costs, increase profits, and minimize false alarms, resulting in systems that do not provide the complete set of features appropriate for the high-security environment of the federal courts.  (Am. Compl. ¶ 9.)  Zwirn

asserts that the security systems that ADT has installed are neither properly designed, monitored, nor maintained.  He alleges that ADT continues to bill the government under the contracts despite being fully aware of the problems in its systems, at the same time certifying that it provides certain essential features, complies with regulatory standards, and meets the expected and contracted-for level of quality and coverage.  (Am. Compl. ¶¶ 10–11.)

Drawing on his knowledge and experience working with alarms, Zwirn points to several alleged shortcomings of ADT's systems, most of which he sets forth "on information and belief." His specific allegations, which are summarized below, are based on flaws he has identified in ADT's residential systems, which he then extrapolates to the kinds of systems that would likely be delivered under ADT's contract with the USMS.  For instance, Zwirn describes how ADT's residential security systems are improperly programmed to delay perimeter-breach alerts, and asserts that the same flaws (and the same faulty assurances of immediate alerts) are present on systems delivered under the federal contracts.  (*See* Am. Compl. ¶¶ 39, 41, 69.)  The amended complaint does not allege that Zwirn has directly investigated or analyzed actual systems built, deployed, or managed under the contracts.

According to Zwirn, high-risk sites should have a minimum set of core components, ranging from rechargeable battery backup systems to master-bedroom panic buttons.  (*See* Am. Compl. ¶ 28.)  ADT itself represents in its marketing materials that its "federal systems division," and its USMS work in particular, both require systems meeting a variety of "high risk" needs.  (Am. Compl. ¶¶ 26–27.)  But allegedly, comparable residential systems installed by ADT fall short in several regards.  ADT does not activate the built-in telephone line fault monitor function or enable the radio backup systems on its residential systems, thereby creating an easily exploitable security hole.  ADT nevertheless tells its customers that they are protected by

3

"properly installed and programmed radio backup systems." (Am. Compl. ¶¶ 34–38.) (With regard to this specific example, the amended complaint refers to a case where the vulnerability was exploited during a home-invasion robbery, leading to two homicides.) Zwirn represents that the "same defective core elements . . . would be included in a Federal judge's home security system." (Am. Compl. ¶ 38.)

The amended complaint sets forth several other purported flaws and omissions in ADT's security systems. ADT informs customers that its residential systems will sound instant alerts if certain parts of the perimeter are breached, but actually programs its devices so that all perimeter zones—and not just the primary entry and exit areas, such as the front and back doors—are "delay" zones with a 30- to 60-second pre-activation lag; as a result, residents are deprived of early warning of intrusion through secondary entrances into the home, police response is delayed, and intruders are not scared away before they can enter. (Am. Compl. ¶¶ 39–43.) ADT also fails to properly install end-of-line resistors, which ordinarily allow alarm systems to internally detect faults occurring between the resistor and the control box. When the resistors are not properly installed, safeguards are bypassed and the system might show as "armed" despite not being fully active. (Am. Compl. ¶¶ 44–48.) ADT is further alleged to use components such as auxiliary power supplies and siren drivers that are not certified by Underwriters Laboratories (UL), and have not met rigorous UL safety and reliability standards. (Am. Compl. ¶¶ 49–53.) Alarm systems also do not warn residents if outside phone lines have been cut, and they fail to monitor certain zone conditions properly. (Am. Compl. ¶¶ 54–56.) Other alleged flaws include control panels not programmed in accordance with industry best practices, tamper switches that are not correctly integrated, and "ambush codes" that are not automatically enabled. (*See* Am. Compl. ¶ 57.)

4

B) <u>Contracts/Misconduct Alleged</u>

Because of the abovementioned flaws and purposeful omissions, Zwirn contends that "[f]ar from providing the sophisticated, high-tech, fail-safe security systems and monitoring services it publicly advertises and represented to the Government . . . , [ADT] has knowingly and intentionally failed to properly design, recommend, install, program, service, test, inspect, maintain, and monitor its security systems, resulting in security systems that suffer from fundamental flaws in their functionality." This misconduct, Zwirn maintains, has put the federal court system and its employees at risk. (Am. Compl. ¶ 10.) On information and belief, Zwirn asserts that "the Contracts provide for [ADT] to receive payments based on [its] representations and/or certifications (express or implied) to the Government and protectees that it properly designs, recommends, installs, programs, and monitors its residential and commercial security systems, in accordance with industry standards, including at least the above-listed residential 'core' elements." (Am. Compl. ¶ 31.) Allegedly, ADT does not deliver on these promises, yet "has presented and continues to present" invoices to the government for payment despite knowing that its systems contain flaws. (Am. Compl. ¶ 11.) Zwirn represents, on information and belief, that the government would not have made payments under the contracts if it knew that ADT had made misrepresentations in obtaining and executing them. (Am. Compl. ¶ 32.)

C) <u>Counts and Prayer for Relief</u>

The amended complaint contains three separate counts under the FCA.

Count 1 accuses ADT of engaging in a continuing "scheme to defraud the . . . Government into approving or paying false claims," in violation of 31 U.S.C. § 3729(a)(1)(A). On information and belief, Zwirn claims that ADT bills the government for those costs and fees

5

related to the design, installation, programming, and monitoring under the contracts, despite being fully aware of its systems' defects; he claims, again on information and belief, that the government would not have paid out these claims had it known the truth about ADT's performance under the contracts.  (Am. Compl. ¶¶ 58–64.)

Count 2 charges another violation of 31 U.S.C. § 3729(a)(1)(A) on the theory of false express or implied certification.  Zwirn contends, upon information and belief, that the relevant contracts contain an express certification provision requiring ADT's performance to conform to the terms therein, as do the invoices ADT submits.  Because ADT's invoices expressly or impliedly certify a certain level of performance set out in the contracts that ADT allegedly knows it has not met, they amount to false claims submitted to the government in contravention of the FCA.  (Am. Compl. ¶¶ 65–74.)

Count 3 alleges the creation of false records material to payment under the contracts, in violation of 31 U.S.C. § 3729(a)(1)(B).  Zwirn asserts that each document ADT provided the government relating to ADT's performance under the contracts is a false record material to a false or fraudulent claim under the FCA.  (Am. Compl. ¶¶ 75–79.)

The amended complaint seeks, among other things, treble damages and a civil penalty of $11,000 for each violation.  (Am. Compl. 22.)

## II. Jurisdiction, Standard of Review, and Governing Law

A) Jurisdiction

This suit arises under 31 U.S.C. § 3730(b)(1), which empowers private persons to bring FCA suits on behalf of themselves and the federal government.  Accordingly, the Court exercises

federal-question jurisdiction pursuant to 28 U.S.C. § 1331 and 31 U.S.C. § 3732(a).  *United States ex rel. Zizic v. Q2Administrators, LLC*, 728 F.3d 228, 234 (3d Cir. 2013).[2]

B) Motions to Dismiss under Fed. R. Civ. P. 12(b)(6); Pleading Standards of Fed. R. Civ. P. 8(a) and 9(b)

A Fed. R. Civ. P. 12(b)(6) motion to dismiss tests the sufficiency of a complaint.  *Kost v. Kozakiewicz*, 1 F.3d 176, 183 (3d Cir. 1993).  In reviewing the motion, a court must accept as true all well-pleaded allegations contained in the complaint while drawing all reasonable inferences in favor of the nonmovant.  *S.H. v. Lower Merion Sch. Dist.*, 729 F.3d 248, 256 (3d Cir. 2013).  Because the complaint in this case alleges fraud, it must satisfy both the general pleading standard contained in Fed. R. Civ. P. 8(a)(2) and the special fraud-pleading standard of Fed. R. Civ. P. 9(b).  *See Cafasso v. Gen. Dynamics C4 Sys.*, 637 F.3d 1047, 1055 & n.5 (9th Cir. 2011) (collecting cases).

Under Fed. R. Civ. P. 8(a)(2), a complaint must contain a short and plain statement of claims showing an entitlement to relief.  The Rule is satisfied under the now well-established

---

[2] The original complaint in this case was filed on May 20, 2010, approximately two months after the FCA was amended by the Patient Protection & Affordable Care Act, Pub. L. 111-148, § 10104(j)(2), 124 Stat. 119, 901-02 (2010).  Previously, the statute's public-disclosure bar would have divested this Court of subject-matter jurisdiction if the Court determined that the claims were based on "the public disclosure of allegations or transactions," unless Zwirn were the "original source" of the publicly disclosed information.  *See* 31 U.S.C. § 3730(e)(4) (2005); *Zizic*, 728 F.3d at 231–32 & n.3; *see also United States ex rel. Lujan v. Hughes Aircraft Co.*, 67 F.3d 242, 248 (9th Cir. 1995) (requiring district court to consider its jurisdiction under the public-disclosure bar prior to reaching the merits of the suit).  The revised statute, which applies here, "deleted the unambiguous jurisdiction-removing language previously contained in § 3730(e)(4) and replaced it with a generic, not-obviously-jurisdictional phrase," making it "clear that the public-disclosure bar is no longer a jurisdiction-removing provision."  *United States ex rel. Radcliffe v. Purdue Pharma L.P.*, 737 F.3d 908, 916 (4th Cir. 2013).

*Twombly/Iqbal*[3] standard if the complaint contains sufficient factual matter, taken as true, to state

a claim that is plausible on its face. *Birdman v. Office of the Governor*, 677 F.3d 167, 171 (3d

Cir. 2012). This determination of plausibility is context-specific, and depends on the kind of

wrong alleged and the facts pleaded in support. *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210–

11 (3d Cir. 2009). A court discards conclusory statements and legal conclusions, including those

masquerading as facts, before evaluating whether what remains shows an entitlement to relief.

*Id.*

Fed. R. Civ. P. 9(b), which applies to fraud claims, requires a party to "state with

particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and

other conditions of a person's mind may be alleged generally." Joining the First, Fifth, and

Ninth Circuits, the Third Circuit recently held that an FCA relator need not offer specific and

representative samples of false claims at the pleading stage. Instead, a relator must allege

"'particular details of a scheme to submit false claims paired with reliable indicia that lead to a

strong inference that claims were actually submitted.'" *Foglia v. Renal Ventures Mgmt., LLC*,

No. 12-4050, ___ F.3d ___, 2014 WL 2535339, at *2 (3d Cir. June 6, 2014) (quoting *United*

*States ex rel. Grubbs v. Kanneganti*, 565 F.3d 180, 190 (5th Cir. 2009)).[4] The *Foglia* holding

builds on prior Third Circuit case law that allowed plaintiffs or relators to use "alternative

means" of injecting precision and substantiation into their claims when reciting the date, time,

and place was not possible. *See Lum v. Bank of Am.*, 361 F.3d 217, 223–24 (3d Cir. 2004).

---

[3] *Ashcroft v. Iqbal*, 556 U.S. 662 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007).

[4] The Court cites to the language of the revised *Foglia* opinion issued on June 10 (http://www2.ca3.uscourts.gov/opinarch/124050pa.pdf) and presently available on Westlaw.

8

However, describing a mere opportunity for fraud does not suffice.  *Foglia*, 2014 WL 2535339, at *3.

## C) <u>False Claims Act Elements</u>

The amended complaint invokes two subsections of the FCA.  The first, § 3729(a)(1)(A),[5] targets those who "knowingly present[], or cause[] to be presented, a false or fraudulent claim for payment or approval."  A prima facie case requires pleading "(1) the defendant presented or caused to be presented to an agent of the United States a claim for payment; (2) the claim was false or fraudulent; and (3) the defendant knew the claim was false or fraudulent."  *United States ex rel. Wilkins v. United Health Grp., Inc.*, 659 F.3d 295, 305 (3d Cir. 2011) (internal quotation marks & citation omitted).  "[T]he submission of false claims to the United States government for approval which do not or would not cause financial loss to the government [is] not within the purview of the [FCA]."  *United States ex rel. Hutchins v. Wilentz*, 253 F.3d 176, 184 (3d Cir. 2001).

The second subsection, § 3729(a)(1)(B), targets those who "make[], use[], or cause[] to be made or used, a false record or statement material to a false or fraudulent claim."  To establish a cause of action under § 3729(a)(1)(B), a relator must plead that the defendant 1) made, used, or caused to be made or used, a false record or statement; 2) the defendant knew the statement to be false, and 3) the statement was material to a false or fraudulent claim.  *Hooper v. Lockheed*

---

[5] The FCA was amended by the Fraud Enforcement and Recovery Act of 2009, Pub. L. No. 111-21, 123 Stat. 1617 (2009).  *See Wilkins*, 659 F.3d at 303–05 & n.12 (discussing statutory revisions).  While both the original and amended complaint refer to the revised statutes only, the suit plainly targets pre- and post-revision misconduct.  Because the case ultimately does not turn on the differences between the old and new revisions, this opinion will use the revised statutory language and subsection references.

*Martin Corp.*, 688 F.3d 1037, 1048 (9th Cir. 2012); *United States ex rel. Pervez v. Beth Isr. Med. Ctr.*, 736 F. Supp. 2d 804, 811 (S.D.N.Y. 2010).

Under the FCA, a false claim can be factually or legally false.[6]  A factually false claim exists when a claimant "misrepresents what goods or services that it provided to the Government."  *Wilkins*, 659 F.3d at 305.  Legally false claims occur when a claimant 1) falsely certifies that it is in compliance with prerequisites to payment ("express false certification") or 2) seeks payment without disclosing that it violated prerequisites to payment, while acting in a way that implies it is in compliance ("implied false certification").  *Id.* at 305–06; *see also id.* at 305 ("[A]n implied false certification theory of liability is premised on the notion that the act of submitting a claim for reimbursement itself implies compliance with governing federal rules that are a precondition to payment." (internal quotation marks & citation omitted)).  The prerequisites can arise from regulations (as in *Wilkins*, 659 F.3d at 309), statutes, or contractual terms.  *United States v. Sci. Applications Int'l Corp.*, 626 F.3d 1257, 1266 (D.C. Cir. 2010); *United States ex rel. Quinn v. Omnicare Inc.*, 382 F.3d 432, 441 (3d Cir. 2004).

However, not every breach amounts to an FCA violation.  *Glynn v. EDO Corp.*, 710 F.3d 209, 218 (4th Cir. 2013).  Rather, the relevant noncompliance must be a precondition to payment from the government.  *Wilkins*, 659 F.3d at 295; *see also United States ex rel. Steury v. Cardinal Health, Inc.*, 625 F.3d 262, 268 (5th Cir. 2010) ("The FCA is not a general enforcement device for federal statutes, regulations, and contracts.  . . . We have thus repeatedly upheld the dismissal of false-certification claims (implied or express) when a contractor's compliance with federal

---

[6] In its reply, ADT challenges certain of the legal theories raised in Zwirn's opposition papers that were not specifically pleaded in the complaint.  (*See* ADT Reply Br. 2, 4, 8.)  However, "under the Federal Rules of Civil Procedure, a complaint need not pin [a] claim for relief to a precise legal theory."  *Skinner v. Switzer*, 131 S. Ct. 1289, 1296 (2011); *see also Engers v. AT&T, Inc.*, 466 F. App'x 75, 79 (3d Cir. 2011) (nonprecedential) (citing *Skinner*).

statutes, regulations, or contract provisions was not a 'condition' or 'prerequisite' for payment under a contract." (internal quotation marks & citation omitted)).  For instance, in assessing damages in cases involving prime contractors, courts look to the number of individual false *demands for payments* made upon the government.  *United States v. Bornstein*, 423 U.S. 303, 309 n.4 (1976) (collecting cases).  Significantly, the FCA does not target the underlying conduct alleged to be fraudulent, or even the wrongful payment itself, but rather the claim for payment. *United States v. Rivera*, 55 F.3d 703, 709 (1st Cir. 1995).  As a result, "[i]f the government would have paid the claims despite knowing that the contractor has failed to comply with certain regulations, then there is no false claim for purposes of the FCA."  *United States ex rel. Conner v. Salina Reg'l Health Ctr., Inc.*, 543 F.3d 1211, 1219–20 (10th Cir. 2008); *see also Wilkins*, 659 F.3d at 307 (citing *Conner* with approval).

### III. Analysis

ADT contends that the complaint fails to satisfy either of the applicable pleading standards because it nowhere sets forth the details of any breach of law or contract and fails to lay forth with the requisite particularity how ADT submitted its allegedly fraudulent claims for payment.  ADT characterizes the lengthy list of supposed flaws in its systems as not falling short of law or contract but rather Zwirn's personal standard of quality.  (*See, e.g.*, ADT Moving Br. 3.)  Zwirn disputes ADT's characterization of his claims, addressing at length the deficiencies of the systems (Zwirn Opp'n Br. 3–10) while arguing that he has satisfied the pleading requirements of the FCA under various theories of liability (Zwirn Opp'n Br. 12–29).

Although briefing in this case completed before it was decided, *Foglia* governs the Court's analysis.  In *Foglia*, the Third Circuit confronted what it called a "close case" involving Medicare fraud.  The well-pleaded facts, accepted as true, satisfied the Third Circuit that the Fed.

11

R. Civ. P. 9(b) requirements had been met; the relator had satisfactorily alleged particular details of a scheme to submit fails claims.  *See Foglia*, 2014 WL 2535339, at *2, *4.

## A) Zwirn Fails to Satisfy the Foglia Standard; His Fraud Claims are Not Pleaded With Particularity

### 1)  *Zwirn Fails to Allege Particular Details of a Fraud Scheme*

Under *Foglia*, a relator must allege particular details of a scheme to submit false claims paired with reliable indicia that lead to a strong inference that claims were actually submitted; the mere opportunity for fraud, without more, does not suffice.  *Id.* at *2–3.  *Foglia* takes its language from the Fifth Circuit's opinion in *Grubbs*, which expanded upon the reasoning behind the "reliable indicia" standard:

> Standing alone, raw bills—even with numbers, dates, and amounts—are not fraud without an underlying scheme to submit the bills for unperformed or unnecessary work.  It is the scheme in which particular circumstances constituting fraud may be found that make it highly likely the fraud was consummated through the presentment of false bills. . . . Confronting False Claims Act defendants with both an alleged scheme to submit false claims and details leading to a strong inference that those claims were submitted—such as dates and descriptions of recorded, but unprovided, services and a description of the billing system that the records were likely entered into—gives defendants adequate notice of the claims.

*Grubbs*, 565 F.3d at 190–91.

The relevant inquiry is whether the scheme itself—and not necessarily individual claims or invoices under that scheme—is alleged with enough particularity.  Zwirn has laid out 23 paragraphs describing problems in the design and deployment of ADT's systems.  The issue is whether the amended complaint successfully uses these allegations, taken as true, to set forth a well-pleaded fraudulent scheme.  The Court finds that it falls short.

The lawsuit is premised on the idea that the contracts between ADT and the government incorporated, either expressly or by reference to laws and regulations, requirements that the

systems meet certain quality standards and that ADT perform certain levels of maintenance and oversight.  (*See, e.g.*, Am. Compl. ¶ 10.)  The amended complaint does not set forth any examples of specific commitments to the government made by ADT, instead extrapolating from ADT's marketing pronouncements, Zwirn's knowledge and experience as an expert in alarm system technology, and a sampling of ADT's (allegedly poor) performance in connection with residential contracts, such as the alleged design defects discussed above.  Based on the "high-risk" needs of the federal judiciary, Zwirn argues that the contracts must have required a certain level of performance which, based on his investigations, ADT does not achieve because it fails to comply with regulations, uses substandard parts, and improperly builds its systems to contain the security holes identified.  (*See* Am. Compl. ¶¶ 31, 34–38.)

However, the amended complaint's suggestions of fraud are not particularized as required by Fed. R. Civ. P. 9(b).  Rather than containing details of the alleged scheme, the amended complaint presents only the broad outlines, and the inferences it offers are not reasonably drawn. It appears, for instance, that Zwirn wants the Court to see a connection between violent acts against judicial officers and ADT's alleged false claims.  In paragraph four, Zwirn refers to the murdering of a federal judge's family members and the unrelated killing (shortly afterwards) of a state judge, court reporter, and sheriff's deputy in an Atlanta courthouse.  In response, both the then-Attorney General of the United States and the Chief Justice of the United States issued statements about the need for increased security, and Congress appropriated $12 million to fund 1600 private alarm systems in federal judges' residences—the largest funding increase for the USMS.  (Am. Compl. ¶¶ 5–7.)  The amended complaint does not tie in these circumstances with contracts between ADT and the USMS.  To the contrary, the amended complaint states that the contractual relationship has existed for the "past 20 years" (Am. Compl. ¶ 3) or it refers to fraud

13

during "the time period of the contracts" (Am. Compl. ¶ 11; *see also* Zwirn Opp'n Br. 26).

These references are unrevealing and vague about time frames, and are inconsistent with a

scheme beginning after budgets were increased and efforts to protect judges were heightened, as

is alleged in paragraph seven.  Zwirn does not squarely allege that these changes allowed greater

opportunity for fraud or meaningfully altered the relationship between ADT and the USMS, but

he also does not plead that the fraud was isolated to the period after 2005–2006.  In a case cited

in *Foglia*, the Ninth Circuit found insufficient "general allegations" that amounted to a "global

indictment of" the targeted business.  *United States ex. rel. Ebeid v. Lungwitz*, 616 F.3d 993,

1000 (9th Cir. 2010).  Such is the circumstance here; Zwirn's allegations amount to an

undifferentiated, general accusation of over 20 years of fraud that is not well grounded on the

technical defects he identifies.

Additionally, the broad and sweeping allegations of the complaint lack precision; taken at

face value, they span decades, jurisdictions, administrations, and corporate identities.  While

naming a single defendant—Tyco, which has assumed ADT's liabilities—the amended

complaint nevertheless speaks of multiple "contract**s**," not a single "contract."  (*See, e.g.*, Am.

Compl. ¶¶ 1, 3, 11, 25, 30.)  Zwirn asserts that "***all*** invoices" submitted "during the subject time

period" amount to false claims under the FCA, on both the direct and certification theories of

liability; further, "***every*** document" pertaining to the features of the alarm systems ADT provided

amounted to a document material to a false claim.  (Am. Compl. ¶¶ 2, 67, 76; Zwirn Opp'n Br.

27 (emphasis added).)  The contracts and invoices are not limited in scope, and could arguably

cover the entire federal judiciary.  Whether a given claim would be fraudulent would depend on

the specifics of the individual contract and the invoices submitted under the contract, but Zwirn

provides no additional detail; he asserts that the contracts exist and surmises that certain terms

14

existed in them.  A blanket assertion of such broad reach is not what even the more liberal Fed.
R. Civ. P. 9(b) pleading standard adopted by this Circuit allows.

Further, much of what is pleaded in the amended complaint is based on information and
belief, including: the description of the contracts' certifications, certain of ADT's alleged
misrepresentations, and ADT's billing practices.  (*See* Am. Compl. ¶¶ 31, 36, 41, 60.)  As ADT
indicates (*see* ADT Moving Br. 24), courts have held that allegations based on information and
belief "do not satisfy Rule 9(b) unless the complaint sets forth the facts upon which the belief is
founded."  *Zavala v. Wal-Mart Stores, Inc.*, 393 F. Supp. 2d 295, 313 (D.N.J. 2005) (Greenaway,
J.) (internal quotation marks & citation omitted); *see also Wayne Invest., Inc. v. Gulf Oil Corp.*,
739 F.2d 11, 13 (1st Cir. 1984) (same).  Nothing in *Foglia* appears to call this principle into
question; thus, the only facts in the amended complaint that have an adequate foundation under
*Zavala* pertain to ADT's performance in ordinary residential installations.  Statements on ADT's
website (*see* Zwirn Opp'n Br. 28) cannot be extended to detail the particular terms of and billing
practices under the contract.  *See Corsello v. Lincare, Inc.*, 428 F.3d 1008, 1013–14 (11th Cir.
2005) (finding inadequately pleaded claims based "on information and belief" when allegations
were broad and based on "improper practices").  Zwirn does not adequately ground his assertions
pertaining to the nature of the contracts and the way matters are billed under them, which are
essential elements to his claims of fraud under the FCA.

    2)  *Zwirn's Allegations Do Not Satisfy the Elements of his FCA Theories*

That the amended complaint fails to allege fraud with the particularity required by the
Third Circuit becomes all the more clear when the elements of each FCA theory are analyzed.
According to Zwirn, ADT's false claims violate the FCA in one of three ways.  First, its invoices
or statements made to prepare them factually affirm or confirm that it has provided services that

it has not provided.  Second, the invoices and related statements affirm or confirm that ADT is in compliance with the underlying contracts (or in compliance with regulations, rules, or statutes upon which the contracts rest), despite ADT knowing that it has not met the relevant standards. Third, even if the invoices cannot be said to contain an affirmative statement, the very act of their submission and preparation implies ADT's following of the contractual terms, which it has not done.  Under the second or third scenarios, the relevant terms must be a condition upon which payment is premised in whole or in part.

a) <u>Factual Falsity</u>

Zwirn's claims of factual falsity—that ADT actively misrepresented or caused the creation of documents misrepresenting the services it provided—compare unfavorably to what the Third Circuit encountered in *Foglia*.  There, relator Foglia, a registered nurse, had alleged in part that the defendant, a dialysis care services company where he had worked for about 20 months, falsely submitted claims for reimbursement for the drug Zemplar.  *Foglia*, 2014 WL 2535339, at *1.  Greatly simplified, the facts alleged that the defendant used 5μg vials of Zemplar, a hyperparathyroidism medicine, in treating patients.  The vials were intended to be single-use only (with excess medicine discarded), but Foglia alleged that the defendant was actually harvesting the unused Zemplar for use in other patients while billing Medicare as if it were following the recommended single-use approach.  *Id.* at *3.  In support of these allegations Foglia provided inventory logs offered to demonstrate a strong likelihood that the defendant was using the leftover medicine.

The Third Circuit's discussion of this issue began by recognizing that, in 2002, the Department of Health and Human Services had revised the Zemplar usage guidelines to allow for multiple uses of the 5μg vials *if* certain protocols were followed; therefore, the inference of

overuse from the medical logs was "not enough to establish a 'strong inference' that false claims were submitted" because, in certain instances, overuse was permitted. *Id.* Accepting the allegations in the complaint of noncompliance as true, the Third Circuit reasoned that:

> we have patient logs that show that less Zemplar was used than would be required if it were used in the single use fashion. We know that Medicare will reimburse for the full vial of Zemplar, regardless of whether all of the Zemplar is used, and that this provides an opportunity for the sort of fraud alleged by Foglia. At this point we must assume that Foglia is correct in alleging that [the defendant] did not follow the procedures that it should have followed if it was to harvest the "extra" Zemplar from the used vials. Although we recognize that this hypothesis could be challenged, it certainly suffices to give [the defendant] notice of the charges against it, as is required by Rule 9(b).

*Id.* at *4. While presenting a "close case" under Fed. R. Civ. P. 9(b), Foglia's allegations ultimately satisfied the standard. *Id.*

Zwirn asserts that factual falsity is met under his allegations because ADT charged for services it did not provide or otherwise misrepresented what it was providing. (Zwirn Opp'n Br. 13–15.) But while the amended complaint contains details of the alleged shortcomings, it fails to make a connection between the shortcomings and the allegations of fraud. The allegations cover more than two decades of possible activity, span the entire country, and involve multiple and undifferentiated contracts and the invoices billed under them. Zwirn does not provide examples of the contracts in question and, apart from arguing by analogy, he does not allege that they include any particular terms or requirements. He lacks the inventory logs of *Foglia* or (as discussed further below) the well-developed federal program, Medicare, that formed the regulatory relationship in that case. Instead, in both his complaint and his opposition papers, Zwirn makes reference to industry best practices—"fundamental" flaws (Am. Compl. ¶ 10), "proper[]" design (Am. Compl. ¶ 11), and his own "vast experience and knowledge" (Am. Compl. ¶ 28)—and other standards such as those contained in the National Electric Code (Am.

17

Compl. ¶ 52; Zwirn Opp'n Br. 18–19) and state statutes and regulations (Zwirn Opp'n Br. 20).

For example, he cites a New Jersey regulation, N.J.A.C. § 13:31A-1.9(a)(2), empowering the

New Jersey Fire Alarm, Burglar Alarm, and Locksmith Advisory Committee to suspend

licensing to those engaged in fraud, along with a similar Florida statute, Fla. Stat.

§ 489.533(1)(b).[7]

  The amended complaint does not set forth a basis from which this Court can connect, by

fact or inference, the individual failures Zwirn identifies with specific representations made

under a contract.  The cases he relies on, such as *United States v. Aerodex, Inc.*, 469 F.2d 1003

(5th Cir. 1972), implicated distinct contractual provisions that were not met: Party A agreed to

provide X, but it instead provided Y.  By contrast, the case here presents allegations about what

should have been provided as part of a larger, integrated system.  Had the government and ADT

contracted for a system containing certain elements, and if ADT then did not provide those

elements but billed for them anyway, under *Aerodex* FCA liability would arguably attach.  But

the allegations made here are not anchored to facts demonstrating that kind of conduct, or that

sort of contractual obligation, on ADT's part.

  b)  Legal Falsity

  The allegations of the amended complaint also fail under both express and implied

certification theories of liability.  Zwirn represents that the government would not have

reimbursed ADT if it had known that ADT's services were not in regulatory compliance.  (Zwirn

Opp'n Br. 16.)  But that the government "would not have paid" had it known about

---

[7] Zwirn also relies on a November 2010 audit of the Judicial Facilities Securities Program.  This
may be a public record that is properly considered under Fed. R. Civ. P. 12(b)(6).  *See Sentinel
Trust Co. v. Universal Bonding Ins. Co.*, 316 F.3d 213, 216 (3d Cir. 2003).  In any event, the
Court concludes that it does not change the outcome of the analysis.

noncompliance is a conclusory statement.  *See United States ex rel. Simpson v. Bayer Healthcare*, 732 F.3d 869, 880 (8th Cir. 2013) (when relator "relied upon a general allegation that the government would not have paid any of the reimbursement claims submitted under the federal health insurance programs had it known of [an] underlying allegedly fraudulent marketing scheme," relator did not satisfactorily state a claim under the FCA).  To the extent that regulatory compliance was a background consideration of the contracts, it is reasonable to infer that the government would have wanted a company installing security systems to "turn square corners," *United States v. Hibbs*, 568 F.2d 347, 349 (3d Cir. 1977), in its dealings and performance.  However, the regulations cited in the amended complaint appear to be the kind of administrative considerations that are deemed conditions of participation rather than conditions of payment.  *See Wilkins*, 659 F.3d at 309 (distinguishing between the two).  For example, Cal. Bus. & Prof. Code § 7599.58 sets monetary penalties for certain violations by alarm companies, whereas Utah Admin. Code r.156-55d-602 sets licensing standards for alarm equipment exceeding or "equivalent to" UL or NEC standards.  Here, were ADT found to be in violation of any of these regulations, it would run the risk of having its license revoked or would incur penalties through an administrative scheme that is separate and distinct from any federal action.  Thus, if suspected of fraud under N.J.A.C. § 13:31A-1.9(a)(2), ADT "may" have its license revoked, and might incur penalties in accordance with N.J.S.A. § 45:1-14 *et. seq*.  While the alarm industry is subject to state and industry regulation (*see* Zwirn Opp'n Br. 15), Zwirn does not contend that ADT was found to be, or was investigated for being, actually noncompliant.  The Court finds that the facts, as pleaded, do not state a plausible claim of false certification, either express or implied.

The cases Zwirn relies on to the contrary are unavailing.  He misstates the outcome

*United States ex rel. Oliver v. Parsons Corp.*, 498 F. Supp. 2d 1260 (C.D. Cal. 2006), an

extremely complex and fact-bound opinion on summary-judgment.  Rather than finding that

nondisclosure of a term "violated the FCA," the court in *Parsons* granted summary judgment for

the relator "on the narrow issue that the failure of Parsons ES to list I&M in its section 2.8.0

disclosure rendered the 1992 and 1994 Disclosure Statements false.'"  *Id.* at 1278.  The court

specifically denied summary judgment for all parties on the other grounds presented, including

that a defendant violated federal regulations pertaining to a certain disclosure.  *See id.* at 1282;

*see also id.* at 1292 (summarizing outcome).  And while the D.C. Circuit in *United States v.*

*Science Applications*, an appeal from a jury verdict, held that a contract need not specifically link

compliance to eligibility for payment, it premised its holding on the plaintiff establishing

materiality "in other ways."  *Sci. Applications*, 626 F.3d at 1269.  The case says nothing about a

burden of pleading, and as discussed above, Zwirn has not pleaded facts from which the Court

can draw an inference that the regulations he cites were conditions of payment either explicitly

or implicitly.[8]

    In sum, because the amended complaint is not, in the context of this particular case,

pleaded with the particularity required by Fed. R. Civ. P. 9(b), it cannot withstand ADT's motion

to dismiss.  The Court finds that the allegations are not sufficiently supported by pleaded facts to

be plausible, *Twombly*, 550 U.S. at 570; they do not provide "adequate notice so that [ADT] can

---

[8] *Science Applications* is on one side of a Circuit split regarding preconditions for payment under implied certification theories of liability.  The Third Circuit does not appear to have joined a side in the split.  *See Dale v. Abeshaus*, No. 06-CV-04747, 2013 WL 5379384, at *13 n.71 (E.D. Pa. Sept. 26, 2013) (discussing split and pointing out lack of Third Circuit authority); *see also Sci. Applications*, 626 F.3d at 1269–70 (discussing split).  Zwirn's claim fails even under a more-lenient reading.

intelligently respond," *Ill. Nat'l Ins. Co. v. Wyndham Worldwide Ops., Inc.*, 653 F.3d 225, 233 (3d Cir. 2011). As the Fifth Circuit wrote in *Grubbs*, the question of precision under Rule 9(b) is one pertaining to a litigant's access to discovery. A well-pleaded complaint narrows the inquiry for the Court's consideration, and dispels concerns about a "fishing expedition," because any angling is "limit[ed] . . . to a small pond that is either stocked or dead." *Grubbs*, 565 F.3d at 190–91. The problems of scope and imprecision identified above reveal the opposite: a case that is broad, covering many years and jurisdictions, and in which little is pleaded to support a specific scheme to defraud a government. These failings compel a finding that this complaint falls under *Foglia* and its predecessors.

3) *The Court Will Not Relax the Rule 9(b) Requirements*

In his opposition brief, Zwirn argues that he should be entitled to a relaxed pleading standard because the material factual information is "peculiarly within the defendant's knowledge or control." (Zwirn Opp'n Br. 29.) The Third Circuit has endorsed this approach in certain cases, such as those alleging corporate fraud. *See, e.g.*, *Craftmatic Sec. Litig. v. Kraftsow*, 890 F.2d 628, 645 (3d Cir. 1989). But the Court is unpersuaded that it should apply here. Zwirn is not an insider and does not claim to be; he is an independent expert with industry experience, and under *Foglia*'s nuanced approach, it is arguable that the Fed. R. Civ. P. 9(b) standard already has been relaxed to account for the difficulties he faces as an outsider relator. Moreover, as the Ninth Circuit stated in *Ebeid*: "To jettison the particularity requirement simply because it would facilitate a claim by an outsider is hardly grounds for overriding the general rule, especially because the FCA is geared primarily to encourage insiders to disclose information necessary to prevent fraud on the government." *Ebeid*, 616 F.3d at 999. The Court finds the reasoning of *Ebeid* to be sound and directly on point.

Finally, in his opposition brief Zwirn seeks to amend the complaint "if the Court perceives deficiencies" in it.  (Zwirn Opp'n Br. 30.)  He urges that he be given an opportunity to engage in "targeted" or "limited" discovery with respect to any such deficiencies so that he may present his proposed amendments to the Court.

Zwirn's request is problematic not only for its failure to heed the requirement that the Court be provided a copy of the proposed amendments with the request, see D.N.J. L. Civ. R. 7.1(f), but because he has had ample time and opportunity to marshal information to sufficiently plead his claims in this case.  His justification is slim: "Any such amendment of the complaint would include allegations that the Relator understands that the Government informed Defendant of certain deficiencies in the Defendant's security systems which Mr. Zwirn has identified in the Complaint."  (Zwirn Opp'n Br. 30.)  As a basis for amendment, this allegation does not save the complaint from dismissal.  The Court agrees with ADT that "Zwirn's proposed amendment, coupled with his failure to allege that the government ever rejected ADT's requests for payment, would disprove his claim that the allegedly missing security system features were conditions of payment under the contracts.  This would be fatal to all of Zwirn's claims."  (Reply Br. 13–14.)  Accordingly, Zwirn's informal request for leave to amend is denied as futile.

## IV. Conclusion

For the reasons set forth above, the Court grants ADT's motion and dismisses the amended complaint.  An appropriate order will be entered.


Date: June 30, 2014                                    /s/ Katharine S. Hayden
                                                       Katharine S. Hayden, U.S.D.J.

22